**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, individually and on behalf of all others similarly situated,

Plaintiff,

v.

VENATOR MATERIALS PLC, SIMON TURNER, KURT D. OGDEN, STEPHEN IBBOTSON, RUSS R. STOLLE, PETER R. HUNTSMAN, SIR ROBERT J. MARGETTS, DOUGLAS D. ANDERSON, DANIELE FERRARI, KATHY D. PATRICK, HUNTSMAN (HOLDINGS) NETHERLANDS B.V., HUNTSMAN INTERNATIONAL LLC, HUNTSMAN CORPORATION, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, GOLDMAN SACHS & CO. LLC, and J.P. MORGAN SECURITIES LLC,

Defendants.

Case. No. 19-cv-7182

CLASS ACTION

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Venator Materials PLC ("Venator" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Venator; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This securities class action is brought on behalf of all persons or entities that: (a) purchased Venator ordinary shares between August 2, 2017 and October 29, 2018, inclusive (the "Class Period"); (b) purchased Venator shares in or traceable to the Company's initial public offering of ordinary shares conducted on or around August 3, 2017 (the "IPO"); and (c) purchased Venator shares in or traceable to the Company's secondary public offering of ordinary shares conducted on or around December 4, 2017 (the "SPO," and together with the IPO, the "Offerings").

2.     The claims asserted herein are alleged against Venator and certain of the Company's officers, members of Venator's Board of Directors, including the Directors that signed the registration statements for the Offerings, the lead underwriters of the Offerings, and the "Selling Shareholders" (defined below) (collectively, "Defendants"), and arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.     Defendant Venator was previously organized as the Pigments & Additives division within defendant Huntsman Corporation ("Huntsman"), a multinational manufacturer of chemical products.   In October 2016, Huntsman began exploring options to separate its Pigments & Additives and Textile Effects divisions from its core business.  On January 17, 2017, Huntsman announced that it would spin off its Pigments & Additives division into a new entity named Venator Materials Corporation.

4.     Upon its separation from Huntsman, Venator would operate through two primary business segments: (a) Titanium Dioxide; and (b) Performance Additives, which consists of its

functional additives, color pigments, timber treatment, and water treatment businesses. The Titanium Dioxide business represented the majority of the Company's revenues. For example, for the twelve months ended March 31, 2017, Venator's Titanium Dioxide segment accounted for over 60% of the Company's adjusted EBITDA.

5.      Titanium Dioxide is a white inert pigment that provides whiteness, opacity and brightness in manufactured items such as coatings, plastics, paper, printing inks, fibers, food, and personal care products. Venator claims to be one of the six major producers of Titanium Dioxide, which collectively account for approximately 60% of global Titanium Dioxide production capacity. Venator alone claimed to have production capacity of approximately 782,000 metric tons per year, accounting for approximately 11% of global Titanium Dioxide production capacity and placing Venator among the top three Titanium Dioxide producers in the world.

6.      On January 30, 2017, a fire ravaged one of Venator's key Titanium Dioxide manufacturing plants located in Pori, Finland. Before the fire, the Pori facility could produce up to 130,000 metric tons of Titanium Dioxide each year, which represented approximately 17% of the Company's total Titanium Dioxide capacity and approximately 2% of total global demand for the chemical.

7.      Following the fire, Huntsman concealed the true extent of the damage to the Pori facility and assured investors that the "fire brigade responded quickly and extinguished the fire." The Company also assured investors that "the site is insured for property damage as well as earnings losses" and "Huntsman is committed to repairing the facility as quickly as possible."

8.      Following the fire at the Pori site, Huntsman reorganized its separation from Venator as an initial public offering of Venator shares, rather than a tax-free spin-off. As a result, the shares would not be distributed to existing Huntsman shareholders, as would have been the

case in a spin-off, but rather were offered to the public, with all proceeds going to Huntsman.

9. On or around August 3, 2017, Venator conducted the IPO, through which more than 26 million ordinary shares of Venator were sold at $20 per share, with Huntsman reaping over $522 million in gross proceeds. Four months after the IPO, on or around December 4, 2017, Venator conducted the SPO, through which an additional 23.7 million ordinary shares of Venator were sold at $22.50 per share, resulting in over $533 million in gross proceeds to Huntsman.

10. In the Offering Materials (defined below) for both the IPO and the SPO, Defendants misrepresented the true extent of the fire damage to Venator's Pori facility, the cost to rehabilitate the facility, and the impact on Venator's business and operations. Throughout the Class Period, the Company repeatedly misrepresented the true extent of the damage at the Pori facility and made reassuring statements to investors regarding the Company's business operations, financial prospects, and the restoration of its Titanium Dioxide production capacity. As a result of these misrepresentations, Venator shares traded at artificially inflated prices throughout the Class Period.

11. The truth began to emerge on July 31, 2018, when Venator revealed that the fire damage at the Pori facility was far more extensive than Defendants had previously represented to investors. Specifically, Venator announced that the cost to repair the facility had climbed to more than $375 million above the insurance policy limits, more than double the amount disclosed to investors just two months after the IPO. On this news, the price of Venator shares declined from $15.35 per share to $14.62 per share.

12. Then, on September 12, 2018, Venator announced that it was abandoning the Pori facility altogether, despite the Company's previous assurances that the site would be repaired and restored back to its full operating capacity. The Company also revealed that the facility was still only operating at 20% capacity and thus had not increased production by any meaningful amount

during the thirteen months since the IPO. During an investor conference call held later that same day, Venator's Chief Executive Officer ("CEO"), Simon Turner, essentially admitted that the Company had misrepresented the true extent of the fire damage. Specifically, when asked by an analyst whether Venator had provided a "misestimate of the initial amount of damage from the fire" and whether "the actual work that needed to be done was missed," Turner agreed that "it was a combination of factors, both of which, you've mentioned already." These disclosures caused the price of Venator shares to decline from $11.35 per share to $10.81 per share.

13. On October 30, 2018, Venator announced that in addition to the over $500 million in costs and lost business associated with the Pori fire incurred to date—which had been covered by Venator's insurance policy—the Company incurred an additional restructuring expense of approximately $415 million and would incur additional "charges of $220 million through the end of 2024" related to the Pori site. As a result of these disclosures, the Company's stock price declined from $8.00 per share to $6.47 per share, or more than 19%, on unusually high trading volume.

14. Ultimately, by October 30, 2018, the price of Venator shares had fallen ***68%*** from the price at which Venator shares were sold to investors in the IPO and ***71%*** from the price at which Venator shares were sold to investors in the SPO.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the

Securities Act (15 U.S.C. §§ 77k, 77l, and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and (d).  Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District.  Many of the acts charged in this Complaint, including the dissemination of materially false or misleading information, occurred in, or emanated from, this District.  In addition, Venator's shares are actively traded within this District.  Furthermore, the Underwriter Defendants (defined below), who each sold millions of Venator shares in both the IPO and the SPO, each maintain their corporate headquarters within this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Plaintiff

18.     Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust is a single-employer defined benefit pension plan covering all City of Miami general and sanitation employees.  As indicated on the certification submitted herewith, Plaintiff purchased ordinary shares of Venator at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Corporate Defendant**

19. Defendant Venator Materials PLC is a United Kingdom corporation with its corporate headquarters located at Titanium House, Hanzard Drive, Wynyard Park, Stockton-On-Tees, TS22 5FD United Kingdom. The Company is the issuer of the ordinary shares sold in the IPO and the SPO. The Company's shares trade on The New York Stock Exchange ("NYSE") under ticker symbol "VNTR." As of May 2, 2019, Venator had over 106 million ordinary shares outstanding.

**C. Officer Defendants**

20. Defendant Simon Turner ("Turner") is, and was at all relevant times, Venator's President and CEO and a Director of the Company. Defendant Turner signed the IPO Registration Statement (defined below) and the SPO Registration Statement (defined below) and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

21. Defendant Kurt D. Ogden ("Ogden") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of Venator. Defendant Ogden signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

22. Defendant Stephen Ibbotson ("Ibbotson") is, and was at all relevant times, Vice President and Corporate Controller of Venator. Defendant Ibbotson signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

23. Defendant Russ R. Stolle ("Stolle") is, and was at all relevant times, Senior Vice

President, General Counsel and Chief Compliance Officer ("COO") of Venator. Defendant Stolle signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

24. Defendants Turner, Ogden, Ibbotson, and Stolle are collectively referred to hereinafter as the "Officer Defendants." The Officer Defendants, because of their positions with Venator, possessed the power and authority to control the contents of Venator's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

**D. Director Defendants**

25. Defendant Peter R. Huntsman ("Peter Huntsman") is, and was at all relevant times, a Director of Venator. Defendant Peter Huntsman signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

26. Defendant Sir Robert J. Margetts ("Margetts") is, and was at all relevant times, a Director of Venator. Defendant Margetts signed the IPO Registration Statement and the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and

misleading statements and omissions in the Offering Materials for the Offerings.

27.     Defendant Douglas D. Anderson ("Anderson") was appointed as a member of Venator's Board of Directors on August 2, 2017.   Defendant Anderson signed the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the SPO Offering Materials.

28.     Defendant Daniele Ferrari ("Ferrari") was appointed as a member of Venator's Board of Directors on August 2, 2017.  Defendant Ferrari signed the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the SPO Offering Materials.

29.     Defendant Kathy D. Patrick ("Patrick") was appointed as a member of Venator's Board of Directors on October 1, 2017.  Defendant Patrick signed the SPO Registration Statement and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the SPO Offering Materials.

30.     Defendants Peter Huntsman, Margetts, Anderson, Ferrari, and Patrick are collectively referred to hereinafter as the "Director Defendants."  The Officer Defendants and the Director Defendants are collectively referred to hereinafter as the "Individual Defendants."  Each of the Individual Defendants signed the IPO Registration Statement and the SPO Registration Statement (except Defendants Anderson, Ferrari and Patrick who only signed the SPO Registration Statement).  In addition, as Directors and/or executive officers of the Company, the Individual Defendants participated in the solicitation and sale of Venator shares to investors in the IPO and the SPO (only with respect to the SPO for Defendants Anderson, Ferrari and Patrick) for their own benefit and the benefit of Venator.  The Individual Defendants, because of their positions with Venator, possessed the power and authority to control the contents of the IPO Offering Materials

and the SPO Offering Materials (only with respect to the SPO Offering Materials for Defendants Anderson, Ferrari and Patrick).

**E. Selling Shareholder Defendants**

31. Defendant Huntsman (Holdings) Netherlands B.V. ("Huntsman Holdings") is a wholly-owned subsidiary of defendant Huntsman Corporation. Huntsman Holdings sold the shares offered in the IPO and the SPO.

32. Defendant Huntsman International LLC ("Huntsman International") is a wholly-owned subsidiary of defendant Huntsman Corporation. Huntsman International sold the shares offered in the IPO.

33. Defendant Huntsman Corporation ("Huntsman") is a multinational manufacturer and marketer of chemical products for consumers and industrial customers. Venator was separated from Huntsman via the IPO, and Huntsman sold the shares offered in the IPO and the SPO through its wholly-owned subsidiaries Defendants Huntsman Holdings and Huntsman International.

34. Defendants Huntsman Holdings, Huntsman International, and Huntsman are collectively referred to hereinafter as the "Selling Shareholders." The Selling Shareholders controlled Venator before, during and immediately after both the IPO and the SPO. Prior to the IPO, the Selling Shareholders beneficially owned all of Venator's ordinary shares and the business and operations of the Company. The Selling Shareholders selected the management and members of the Venator Board of Directors prior to the IPO, many of whom were long-time Huntsman employees, and continued to exert control and influence over the Company throughout the relevant time period. According to the SPO Prospectus, "Huntsman controls a majority of the voting power of our outstanding ordinary shares. As a result, we are a 'controlled company' within the meaning of the corporate governance standards of the NYSE."

**F. Underwriter Defendants**

35. Defendant Citigroup Global Markets Inc. ("Citigroup") served as a representative lead underwriter of the IPO and the SPO and sold millions of Venator shares in both Offerings. As an underwriter of the IPO and the SPO, Citigroup was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

36. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as a representative lead underwriter of the IPO and the SPO and sold millions of shares of Venator shares in both Offerings. As an underwriter of the IPO and the SPO, Merrill Lynch was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

37. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as a representative lead underwriter of the IPO and the SPO and sold millions of shares of Venator shares in both Offerings. As an underwriter of the IPO and the SPO, Goldman Sachs was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

38. Defendant J.P. Morgan Securities LLC ("JP Morgan") served as a representative lead underwriter of the IPO and the SPO and sold millions of shares of Venator shares in both Offerings. As an underwriter of the IPO and the SPO, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the IPO Offering Materials and the SPO Offering Materials.

39. Defendants Citigroup, Merrill Lynch, Goldman Sachs, and JP Morgan are collectively referred to hereinafter as the "Underwriter Defendants." The Underwriter Defendants

sold and distributed the ordinary shares in the Offerings.

## BACKGROUND

40. Venator is a global chemical company primarily focused on the development and manufacture of Titanium Dioxide. Titanium Dioxide is a naturally occurring, opaque mineral that is used to enhance whiteness, opacity, and brightness in thousands of manufactured items such as coatings, plastics, paper, paints, inks, fibers, food, and personal care products, and is the mainstay of Venator's range of products.

41. On January 30, 2017, a fire broke out at Venator's Pori facility, which was one of the Company's most important plants for manufacturing Titanium Dioxide. In total, the Pori facility was responsible for producing approximately 17% of the Company's total Titanium Dioxide capacity.

42. Following the fire, Venator conducted an initial public offering of its ordinary shares in August 2017, followed by a secondary public offering of ordinary shares in December 2017.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

43. The Class Period begins on August 2, 2017, when the SEC declared Venator's registration statement for the IPO effective. On or around August 3, 2017, Venator conducted an IPO pursuant to a registration statement that the Company filed with the SEC on May 5, 2017 and which, after six amendments, was declared effective by the SEC on August 2, 2017 (the "IPO Registration Statement"). On August 4, 2017, Venator filed a prospectus for the IPO on Form 424B4 (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement (collectively, the "IPO Offering Materials"). The IPO Registration Statement was signed by the Officer Defendants, and Defendants Peter Huntsman and Margetts. By means of the

IPO Offering Materials, Venator offered and sold more than 26 million ordinary shares (which included the underwriters' exercise in full of their option to purchase an additional 3,405,000 ordinary shares) at $20.00 per share, resulting in over $522 million in gross proceeds for Huntsman.

44. The IPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents. Specifically, the IPO Offering Materials misrepresented the true extent of the fire damage to Venator's Pori facility, the cost to rehabilitate the facility, and the impact on Venator's business and operations because of the damage to the facility. Specifically, the IPO Prospectus stated that as a result of fire damage, the Company's Pori facility is "currently not fully operational" but "[w]e are committed to repairing the facility as quickly as possible" and "[w]e expect the Pori facility to restart in phases as follows: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."

45. The IPO Prospectus also stated that the Pori facility would be fixed with insurance proceeds within the policy limit. Specifically, the IPO Prospectus stated that the "site is insured for property damage as well as business interruption losses" and that Venator was "working with [its] insurer to recoup losses incurred as a result of the fire." Similarly, the IPO Prospectus stated: "We have established a process with our insurer to receive timely advance payments for the reconstruction of the facility as well as lost profits." The IPO Prospectus also stated that, pursuant to the Company's separation agreement with Huntsman, "Venator will have the benefit of the property and business interruption insurance proceeds related to the covered repair costs or covered lost profits following

this offering related to the Pori fire."

46. The IPO Prospectus also represented that the damage to the Pori facility would not have a material adverse impact to Venator's earnings during its second quarter. In particular, the IPO Prospectus stated that "[w]e do not expect the fire at our Pori facility to have a material impact on our second quarter Segment Adjusted EBITDA as related losses have been offset by the proceeds of business interruption insurance which was prepaid during the quarter."

47. The IPO Prospectus also claimed that Venator was "well-positioned to capitalize" on growth opportunities in the Titanium Dioxide market. Crucial to this purported positioning was the Company's "782,000 metric tons" of annual production capacity, which included 130,000 metric tons from the Pori facility, as if the facility were operating at full capacity. Specifically, the IPO Prospectus stated that "[w]e believe that our Titanium Dioxide segment is well-positioned to take advantage of an improvement in the [Titanium Dioxide] industry cycle." Similarly, the IPO Prospectus stated that "[w]ith approximately 782,000 metric tons of annual nameplate production capacity, we believe that we are well-positioned to capitalize on recovering [Titanium Dioxide] demand and prices." These representations indicated not only that Venator would be able to bring the Pori facility back to full capacity in the near term, but that the Company would grow financial results beyond historical figures.

48. Likewise, the IPO Prospectus claimed that the Company's "782,000 metric tons" of annual production capacity, which again included full production from the Pori facility, made it the "leader in the specialty [Titanium Dioxide] industry segment, which includes products that sell at a premium and have more stable margins" as well as the "[Titanium Dioxide] market leader in the fibers and films, cosmetics and food end markets, and are at the forefront of innovation in these applications, with an exciting pipeline of new products and developments that we believe will further

enhance our competitive position." The IPO Prospectus further stated that the Company has "a leading position in differentiated markets, including performance plastics and printing inks, as well as in a variety of niche market segments where innovation and specialization are high" and "[w]e believe the differentiation of our products allows us to generate greater growth prospects and stronger customer relationships."

49.     In the "Risk Factors" section of the IPO Prospectus, the Company stated that "if the [insurance] proceeds do not fully cover our property damage, business interruption, lost profits or other losses [as a result of the Pori facility fire], this will adversely affect our earnings."

50.     The statements set forth above in ¶¶44-49 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in additional costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's reported annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%. Further, the ostensible risks that Defendants identified in the IPO Prospectus were false and misleading because those risks had already materialized at the time the statements were made and were negatively impacting the Company's business. As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

51.     Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required

Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the IPO Offering Materials to disclose the true extent of the fire damage at the Pori facility and the time and cost it would take to rebuild the facility or procure a replacement violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Venator shares speculative or risky.

52. On August 28, 2017, Venator issued a press release announcing its financial results for the quarter ended June 30, 2017. In the press release, which was also filed with the SEC on Form 8-K, Defendant Turner touted the Company's financial results and is quoted as stating that the Company's "strong second quarter results underscore the quality of the Venator business."

53. That same day, the Company filed its quarterly report with the SEC on Form 10-Q for the second quarter ended June 30, 2017. The 10-Q was signed by Defendants Ogden and Ibbotson and contained certifications by Defendants Turner and Ogden that attested to the purported accuracy and completeness of the 10-Q. The 10-Q misrepresented the true extent of the fire damage to Venator's Pori facility, the cost to rehabilitate the facility, and the impact to Venator's business and operations because of the damage to the facility. In particular, the Company's 10-Q stated that as a result of fire damage, the Pori facility is "currently not fully

operational" but "[w]e are committed to repairing the facility as quickly as possible."

54.     In the 10-Q, the Company also assured investors that the Pori facility would be fixed with insurance proceeds within the policy limit.  Specifically, the 10-Q stated that the "site is insured for property damage as well as business interruption losses."  Similarly, the 10-Q stated: "We have established a process with our insurer to receive timely advance payments for the reconstruction of the facility as well as lost profits."  The 10-Q also stated that, pursuant to the Company's separation agreement with Huntsman, "Venator has the benefit of the property damage and business interruption insurance proceeds related to covered repair costs or covered lost profits incurred related to the Pori fire."

55.     The 10-Q also claimed that not only would Venator be able to bring the Pori facility back to its full production capacity of 130,000 metric tons of Titanium Dioxide in the near term, but that the Company would grow financial results beyond historical figures.  Specifically, the 10-Q stated that "[a] portion of our white end production became operational during the second quarter of 2017, and we expect the Pori facility to restart in phases as follows: approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."  Further, the 10-Q listed the Company's establishment of a "process to receive timely advance insurance payments for the continued reconstruction of the Pori facility as well as for business interruption losses" as one of several factors that Venator expected to positively "impact [its] operating results and drive a net increase in Segment adjusted EBITDA from the second quarter of 2017 to the third quarter of 2017."

56.     The Company also represented that the Pori facility fire did not have a material adverse impact on its second quarter earnings beyond the relatively modest increase in business disruption costs.  Specifically, the 10-Q stated that "[t]he fire at our Pori facility did not have a

material impact on our 2017 second quarter operating results as losses incurred were offset by insurance proceeds."

57.    The statements set forth above in ¶¶52-56 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%.  As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

58.    On or around September 6, 2017, Venator posted to its website a slide presentation prepared by the Company for use at the UBS Global Chemicals & Paper and Packaging Conference held in New York City on September 6, 2017.  The presentation stated that the Pori "[s]ite [is] expected to be fully operational by 4Q 2018."

59.    The statement set forth above in ¶58 was materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs,

in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%. As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

60. On October 27, 2017, Venator issued a press release announcing its financial results for the third quarter ended September 30, 2017. The press release, which was also filed with the SEC on Form 8-K, stated that Venator had experienced favorable operating results during the quarter. In particular, the press release stated that "[d]ue to prevailing strong market conditions, our [Titanium Dioxide] selling prices continue to improve and our business is benefitting from the improved profitability and cash flows" but "[t]his also has the effect of increasing our insurance claim for lost earnings from the Pori site." While the release stated that costs associated with the Pori fire were now likely to exceed the $500 million policy limit by $100 to $150 million, it misled investors to believe that this increased cost estimate was primarily due to favorable market conditions and increased prices for Titanium Dioxide (*i.e.*, an increase in lost profits), and not costs associated with the reconstruction of the Pori site. The press release also stated that the most profitable segments of the Pori facility, which produced specialty products that accounted for approximately 75% of the site's earnings, was "already running at 20% of [the] previous [60%] capacity and we intend to restore manufacturing of the balance of these more profitable specialty products as quickly as possible in 2018," with the site's remaining 40% production capacity of less profitable segments to be completed later.

61. That same day, Venator held an earnings conference call to discuss the Company's

2017 third quarter financial results. During the call, Defendant Turner stated that the more profitable "specialty" part of the Pori facility would be restored first, which would purportedly allow Venator to generate "75% of Pori earnings potential . . . by the end of 2018." In response to an analyst question about the Pori facility's remaining 40% capacity, Defendant Turner reassured investors, stating: "So we're not saying it's going to be delayed. We're not saying we won't do it." During the call, Defendant Ogden also provided an update on the rebuild of the Pori facility and indicated that the increased cost estimate was primarily due to favorable market conditions and increased prices for Titanium Dioxide. Specifically, Defendant Ogden stated that the "$500 million insurance policy is more than enough to cover the costs of the rebuild on its own, but because the insurance policy also covers lost earnings," strong market conditions and higher Titanium Dioxide selling prices "ha[ve] the effect of increasing our insurance claim for lost earnings from the Pori site." Defendant Ogden also stated that the Company "expect[s] to contain these over-the-limit costs within $100 million to $150 million" and noted that the Company is "already running at 20% site capacity, and we intend to restore manufacture of the balance of these more profitable specialty products as quickly as possible in 2018."

62. On November 3, 2017, the Company filed its quarterly report with the SEC on Form 10-Q for the third quarter ended September 30, 2017. The 10-Q was signed by Defendants Ogden and Ibbotson and contained certifications by Defendants Turner and Ogden that attested to the purported accuracy and completeness of the 10-Q. The 10-Q stated that, as a result of the fire, the Pori facility is "currently not fully operational" but the Company "continue[s] to repair the facility."

63. The Company also touted that it had experienced favorable operating results during the quarter. In particular, the 10-Q stated that "[d]ue to prevailing strong market conditions, our

[Titanium Dioxide] selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows" but "[t]his also has the effect of increasing our total anticipated business interruption losses from the Pori site." The 10-Q also stated that costs associated with the Pori fire were now likely to exceed the $500 million policy limit by $100 to $150 million, and it misled investors to believe that this increased cost estimate was primarily due to favorable market conditions and increased prices for Titanium Dioxide (*i.e.*, an increase in lost profits), and not costs associated with the reconstruction of the Pori facility.

64. In the 10-Q, the Company also stated that the most profitable segments of the Pori facility—60% of the site capacity which produced specialty products that accounted for greater than 75% of the site's earnings during the two years prior to the fire—was "currently operating at 20% of total prior capacity" but the Company "intend[s] to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018," with the site's less profitable segments to be completed later.

65. The 10-Q represented that the Pori facility fire did not have a material adverse impact on the Company's third quarter earnings beyond the relatively modest increase in business disruption costs. Specifically, the 10-Q stated that "[t]he fire at our Pori facility did not have a material impact on our 2017 third quarter operating results as losses incurred were offset by insurance proceeds."

66. The statements set forth above in ¶¶60-65 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in

excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%.  As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

67.     On or around December 4, 2017, Venator conducted a secondary public offering of ordinary shares pursuant to a registration statement that the Company filed with the SEC on November 27, 2017 which was declared effective by the SEC on November 29, 2017 (the "SPO Registration Statement").  On December 1, 2017, Venator filed a prospectus for the SPO on Form 424B4 (the "SPO Prospectus"), which incorporated and formed part of the SPO Registration Statement (collectively, the "SPO Offering Materials").  The SPO Registration Statement was signed by the Officer Defendants and the Director Defendants.  By means of the SPO Offering Materials, Venator offered and sold more than 23.7 million ordinary shares (which included the underwriters' purchase of an additional 1,948,955 ordinary shares pursuant to a partial exercise of their over-allotment option) at $22.50 per share, resulting in over $533 million in gross proceeds to Huntsman.  The IPO Offering Materials and the SPO Offering Materials are referred to herein collectively as the "Offering Materials."

68.     The SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

69.     Specifically, like the IPO Offering Materials, the SPO Offering Materials misrepresented the true extent of the fire damage to Venator's Pori facility, the cost to rehabilitate the facility, and the impact to Venator's business and operations because of the damage to the facility.  The SPO Prospectus stated that, as a result of the fire, the Pori facility is "currently not fully operational" but the Company "continue[s] to repair the facility."  The SPO Prospectus also stated that the most profitable segments of the Pori facility—60% of the site capacity which produced specialty products that accounted for greater than 75% of the site's earnings during the two years prior to the fire—was "currently operating at 20% of total prior capacity" but the Company "intend[s] to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018," with the site's less profitable segments to be completed later.

70.     The SPO Prospectus represented that the modest increase in estimated costs above the insurance policy limits related to the Pori facility fire was primarily due to favorable market conditions and increased Titanium Dioxide selling prices.  In particular, the SPO Prospectus stated that "[d]ue to prevailing strong market conditions, our [Titanium Dioxide] selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows" but "[t]his also has the effect of increasing our total anticipated business interruption losses from the Pori site."  The SPO Prospectus also stated that the cost estimate to repair the Pori facility now would exceed the aggregate insurance limit but the Company "expect[s] to contain these over-the-limit costs within $100 million to $150 million."

71.     The SPO Prospectus also indicated that the Pori facility fire would not have a material adverse impact to Venator's earnings beyond the relatively modest increase in business disruption costs.  Specifically, the SPO Prospectus stated that the Pori facility fire "did not have a

material impact on our 2017 third quarter operating results as losses incurred were offset by insurance proceeds." The SPO Prospectus also stated that the "site is insured for property damage as well as business interruption losses" and that the Company had "established a process with our insurer to receive timely advance payments for the reconstruction of the facility as well as business interruption losses, subject to policy limits."

72.     In the SPO Prospectus, Venator also stated that it was "well-positioned to capitalize" on growth opportunities in the Titanium Dioxide market. Crucial to this purported positioning was the Company's "782,000 metric tons" of annual capacity, which included 130,000 metric tons from the Pori facility, as if the facility were operating at full capacity. In particular, the SPO Prospectus stated that "[w]e believe that our Titanium Dioxide segment is well-positioned to take advantage of an improvement in the [Titanium Dioxide] industry cycle." Similarly, the SPO Prospectus stated that "[w]ith approximately 782,000 metric tons of annual nameplate production capacity, we believe that we are well-positioned to capitalize on recovering [Titanium Dioxide] demand and prices." These representations indicated not only that Venator would be able to bring the Pori facility back to full capacity in the near term, but that the Company would grow financial results beyond historical figures.

73.     Similarly, in the SPO Prospectus, the Company claimed that its "782,000 metric tons" of annual capacity, which again included full production from the Pori facility, made it the "leader in the specialty [Titanium Dioxide] industry segment, which includes products that sell at a premium and have more stable margins" as well as the "[Titanium Dioxide] market leader in the fibers and films, cosmetics and food end markets, and are at the forefront of innovation in these applications, with an exciting pipeline of new products and developments that we believe will further enhance our competitive position." The SPO Prospectus further stated that the Company has "a

leading position in differentiated markets, including performance plastics and printing inks, as well as in a variety of niche market segments where innovation and specialization are high" and "[w]e believe the differentiation of our products allows us to generate greater growth prospects and stronger customer relationships."

74. The statements set forth above in ¶¶69-73 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%. As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

75. Moreover, the failure of the SPO Offering Materials to disclose the true extent of the fire damage at the Pori facility and the time and cost it would take to rebuild the facility or procure a replacement violated 17 C.F.R. § 229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Venator shares speculative or risky.

76.     On February 23, 2018, Venator issued a press release providing its financial results for the quarter ended December 31, 2017—the same quarter during which Venator conducted the SPO—and the full year for 2017.  The press release, which was also filed with the SEC on Form 8-K, stated that the cost estimates to rebuild the Pori facility had increased significantly and would now exceed insurance proceeds by as much as $375 million, more than double the estimate provided in the SPO Offering Materials.  The release stated that part of this increased cost was due to Venator "paying a fast-track premium" to accelerate the reconstruction of more profitable specialty production segments of the Pori facility, which the Company expects to be "complete by the end of 2018."  Additionally, in the press release, Defendant Turner is quoted as stating "we remain on schedule to restore our specialty business capacity, and ultimately full operation of the remaining capacity as economic conditions warrant at our Pori, Finland site."

77.     That same day, the Company filed its annual report with the SEC on Form 10-K for the year ended December 31, 2017.  The 10-K was signed by Defendants Turner, Ogden and Ibbotson and contained certifications by Defendants Turner and Ogden that attested to the purported accuracy and completeness of the 10-K.  The 10-K stated that Pori facility experienced fire damage but the Company "continue[s] to repair the facility."

78.     In the 10-K, the Company also represented that it had experienced favorable operating results for the fiscal year 2017.  In particular, the 10-K stated that "[d]ue to prevailing strong market conditions, our [Titanium Dioxide] selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows" but "[t]his also has the effect of increasing our total anticipated business interruption losses from the Pori site."  The 10-K also stated that costs associated with the Pori fire were now likely to exceed the $500 million policy limit by as much as $375 million, and it misled investors to believe that this

increased cost estimate was primarily due to favorable market conditions and increased prices for Titanium Dioxide (*i.e.*, an increase in lost profits), and not costs associated with the reconstruction of the Pori site.

79.     The 10-K also stated that the most profitable segments of the Pori facility—60% of the site capacity which produced specialty products that accounted for greater than 75% of the site's earnings during the two years prior to the fire—was "currently operating at 20% of total prior capacity" but the Company "intend[s] to restore manufacturing of the balance of these more profitable specialty products by the end of 2018," with the site's less profitable segments to be completed later.

80.     The 10-K represented that the Pori facility fire did not have a material adverse impact on the Company's fourth quarter earnings beyond the relatively modest increase in business disruption costs.  Specifically, the 10-K stated that "[t]he fire at our Pori facility did not have a material impact on our 2017 fourth quarter operating results as losses incurred were offset by insurance proceeds."

81.     That same day, the Company also held an earnings conference call to discuss the Company's financial results for the fourth quarter and full year 2017.  During the conference call, Defendant Turner stated that the Company is "keen to restore" the "high-value specialty and differentiated products" portion of the Pori facility "as quickly as possible as it provides approximately 75% of site EBITDA" and that "construction on the rebuild of the specialty products portion of the facility is on pace" and expected to be complete by the end of 2018. Defendant Turner also stated that the cost to rebuild the Pori facility would exceed the Company's insurance proceeds by $325 million and the "cost could be as much as $375 million."  Defendant Turner also stated that the Company is paying a "fast-track premium" and "remain[s] on track with

our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018"
but the remaining 40% of the site's commodity capacity "will be reintroduced to the market at a
more normalized pace but not before 2020."  During the call, Defendant Ogden stated that in the
"most likely case" the Company's "current estimates are $325 million to rebuild the entire site,"
with additional contingency added "simply out of a measure of prudence and conservatism."

82.    The statements set forth above in ¶¶76-81 were materially false and misleading
because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors,
rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion,
hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the
Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in
excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost,
essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility,
and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the
Company's annual Titanium Dioxide production capacity had been inflated by approximately
104,000 metric tons, or 15%.  As a result of the foregoing, Venator would incur over $600 million
in restructuring expense and additional charges associated with the closure and replacement of the
Pori facility.

83.    On May 1, 2018, Venator issued a press release announcing "[s]trong" financial
results for the Company's first quarter ended March 31, 2018.  In the press release, which was also
filed with the SEC on Form 8-K, Defendant Turner is quoted as saying that "[w]e continue to make
progress on the construction phase of our complex Pori project" and "[o]ur current estimate for
the self-funded portion of the reconstruction and commissioning remains within the range of our
previous guidance of $325 to $375 million."  Further, the release stated that "20% of the sites prior

total capacity is available for production" and "[w]e are focused on restoring an additional 40% of capacity as quickly as possible to reach an aggregate 60% of former site capacity for manufacturing of our higher value specialty products" and "expect some of this additional capacity to be producing finished product during the second half of this year, and the remaining specialty capacity to be restored and producing finished product during 2019." The press release also stated that the Company "intend[s] to rebuild the commodity production capacity of the facility, but do not currently expect it to produce product prior to 2020."

84.     That same day, the Company filed its quarterly report with the SEC on Form 10-Q for the first quarter ended March 31, 2018. The 10-Q was signed by Defendants Ogden and Ibbotson and contained certifications by Defendants Turner and Ogden that attested to the purported accuracy and completeness of the 10-Q. The 10-Q stated that the Pori facility experienced fire damage but the Company "continue[s] to repair the facility."

85.     In the 10-Q, Venator also stated that it had "restored 20% of the total prior capacity, which is dedicated to production of specialty products, and we intend to restore manufacturing of the balance of these more profitable specialty products as quickly as possible." The 10-Q also stated that the Company "expect[s] some of this specialty capacity to be producing finished product during the second half of this year and the remaining specialty capacity to be restored and producing finished product during 2019." Further, the 10-Q stated that the Company "expect[s] to rebuild the commodity portion of the facility, but do not expect it to be reintroduced into the market prior to 2020." The 10-Q stated that the Company continues to "estimate that the total cost to rebuild and commission the Pori facility will exceed the total insurance proceeds received by $325 to $375 million."

86.     The 10-Q represented that the Pori facility fire did not have a material adverse

impact on the Company's 2018 first quarter earnings beyond the relatively modest increase in business disruption costs.  In particular, the 10-K stated that "[t]he fire at our Pori facility did not have a material impact on our 2018 first quarter or our 2017 year to date operating results, as losses incurred were offset by insurance proceeds."

87.     That same day, the Company also held an investor conference call to discuss the Company's financial results for the first quarter 2018.  During the call, Defendant Turner stated that "[w]e continue to make progress on the construction phase of the rebuild" and estimates of the reconstruction and commissioning of the Pori site remain unchanged at $325 to $375 million above the insurance proceeds.  Further, Defendant Turner stated that although only 20% of the site's prior capacity for the production of finished specialty products was available "[w]e expect to restore additional capacity and be producing some finished specialty product during the second half of 2018" with the remaining capacity to be fully restored during 2019.  Defendant Turner also stated that "we currently intend to rebuild the commodity portion of the facility" but "do not currently expect product from it to be reintroduced to the market prior to 2020."

88.     During the call, in response to an analyst question regarding the level of confidence the Company had with respect to its estimated range of $325 million to $375 million for the Pori site rebuild, Defendant Turner stated that the Company has "confidence, along with the fact that we continue to use [ ] new information to model a range of outcomes and scenarios around the cost and timeline, and that's what draws us back to reiterate that we are in this range of $325 million to $375 million."

89.     The statements set forth above in ¶¶83-88 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion,

hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%.  As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

90.     On or around May 15, 2018, Venator posted to its website a slide presentation prepared by the Company for use at the Goldman Sachs Basic Materials Conference held in New York City on May 15, 2018.  The presentation stated that among the Company's priority of its cash uses for "[o]pportunistic [s]trategic [t]ransactions" was "[e]arnings [g]rowth," to be driven by the "Pori reconstruction" which the Company estimated to cost between $325 million and $375 million in self-funding.  Further, the presentation stated that Venator's "[s]trong free cash flow generation will enable the rebuild of our Pori, Finland facility and debt reduction improving equity value."

91.     The statements set forth above in ¶90 were materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without

prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%. As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

**THE TRUTH EMERGES**

92.     The truth began to emerge on July 31, 2018, when Venator disclosed that the fire damage was far more extensive than Defendants represented to investors in the IPO Offering Materials and the SPO Offering Materials and throughout the Class Period. As a result, the costs of a full rebuild would substantially exceed $375 million in Company-funded costs above the insurance policy limits. The press release stated that "a full rebuild and commissioning may require more self-funding than our previous estimate of $325 to $375 million and may result in a longer period of time for project completion." The press release also stated that the Company is "reviewing options within our manufacturing network, including the option of transferring the production of Pori's specialty and differentiated products to elsewhere in our network, and are pacing our on-going construction activities at Pori accordingly during this period of review."

93.     That same day, the Company also filed its quarterly report with the SEC on Form 10-Q for the second quarter ended June 30, 2018. In the 10-Q, the Company revealed that "additional damage outside the immediate fire zone leading to increased costs" and "a full rebuild and commissioning of our Pori facility may require more self-funding than our previous estimate of $325 to $375 million, and may result in a longer period of time for project completion." The 10-Q also stated that "the Pori reconstruction and commissioning process is currently under review," and specifically that the Company is "reviewing options within our manufacturing

network, including the option of transferring the production of Pori's specialty and differentiated products to elsewhere in our network, and are pacing our on-going construction activities at Pori accordingly during this period of review."  As a result of these disclosures, the price of Venator shares dropped from $15.35 per share to $14.62 per share.

94.     However, the Company continued to misrepresent the true impact the Pori fire would have on Venator's business.  Specifically, in the July 31 press release, Defendant Turner is quoted as saying that the Company remains "well positioned to capitalize on the positive trends supporting [Titanium Dioxide] industry profitability," despite the substantial fire damage to the Pori facility.

95.     The statement set forth above in ¶94 was materially false and misleading because: (a) the fire damage at the Pori facility was far more extensive than disclosed to investors, rendering the facility beyond repair; (b) the true cost of the Pori facility fire exceeded $1 billion, hundreds of millions of dollars beyond the limits of the Company's insurance policy; (c) the Company was paying rebuilding premiums, and thereby incurring tens of millions of dollars in excessive costs, in a futile attempt to expedite the rehabilitation process; (d) Venator had lost, essentially without prospect of rehabilitation, 80% of the production capacity of the Pori facility, and thus lost a substantial portion of one of its largest revenue producing assets; and (e) the Company's annual Titanium Dioxide production capacity had been inflated by approximately 104,000 metric tons, or 15%.  As a result of the foregoing, Venator would incur over $600 million in restructuring expense and additional charges associated with the closure and replacement of the Pori facility.

96.     On September 12, 2018, however, Venator announced that it was abandoning the Pori facility.  At the time, the facility was only operating at 20% capacity, meaning that production capacity at the facility had still not increased by any meaningful amount during the more than one

year that had passed since the IPO, despite Venator having received $551 million in insurance proceeds and incurring $247 million in capital expenditures and clean-up costs as of June 30, 2018. The release further revealed that the "cost escalation and extended timeline" to repair the Pori facility was "associated with the reconstruction" of the site.  In addition, a slide presentation the Company prepared in connection with this announcement stated that the "[e]stimated cost of the full reconstruction of Pori is not economically viable for Venator" and further revealed that the Company would also incur up to $150 million in closure costs for the Pori facility.

97.     That same day, during an investor conference call to discuss the closure of the Pori facility, Defendant Turner essentially admitted that the Company had misrepresented the true extent of the fire damage.  When asked by an analyst whether Venator had provided a "misestimate of the initial amount of damage from the fire" and whether "the actual work that needed to be done was missed," Defendant Turner agreed that "it was a combination of factors, both of which, you've mentioned already."  During the call, Defendant Turner also conceded that Venator was not a leading producer of Titanium Dioxide, despite previously touting the Company as such to investors during the Class Period, because the production capacity at the Pori facility had not meaningfully increased since the Company's IPO.  Specifically, Defendant Turner remarked that the Company was confident in its ability to transfer Titanium Dioxide production previously at the Pori facility to other sites within its manufacturing network and "restor[e] Venator's position as a leading producer of specialty and differentiated [Titanium Dioxide]."  As a result of these disclosures, the price of Venator shares dropped from $11.35 per share to $10.81 per share.

98.     Then, on October 30, 2018, Venator revealed that in addition to the over $500 million in costs and lost business associated with the Pori fire incurred to date—which had been covered by Venator's insurance policy—the Company incurred an additional restructuring charge

of approximately $415 million and would incurred additional "charges of $220 million through the end of 2024" related to the Pori site. Accordingly, the true cost of the Pori facility fire exceeded $1 billion—hundreds of millions of dollars beyond the Company's insurance policy limits and more than four times greater than the amount disclosed to investors just months after the IPO.

99. As a result of these disclosures, the Company's stock price plunged more than 19% from a closing price of $8.00 per share on October 29, 2018 to a closing price of $6.47 per share on October 30, 2019, on unusually high trading volume.

100. The $6.47 per share price of Venator shares at the end of the Class Period was ***68% below*** the price at which Venator shares were sold to investors in the IPO and ***71% below*** the price at which Venator shares were sold to investors in the SPO.

**LOSS CAUSATION**

101. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Venator's shares and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Venator's shares fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Venator's shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**CLASS ACTION ALLEGATIONS**

102. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired: (a) the publicly traded ordinary shares of Venator during the Class Period; (b) Venator ordinary shares

in or traceable to the Company's IPO; and (c) Venator ordinary shares in or traceable to the Company's SPO (the "Class").   Excluded from the Class are Defendants and their families, Directors, and officers of Venator and their families and affiliates.

103.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of May 2, 2019, Venator had over 106 million ordinary shares outstanding, owned by hundreds or thousands of investors.

104.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    (a)   Whether Defendants violated the Securities Act and/or the Exchange Act;

    (b)   Whether Defendants omitted and/or misrepresented material facts;

    (c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    (d)   Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

    (e)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    (f)   Whether Defendants' conduct impacted the price of Venator's ordinary shares;

    (g)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

    (h)   The extent of damage sustained by Class members and the appropriate measure of damages.

105.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

106. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

107. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

108. Venator's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

109. Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Venator who knew that the statement was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

110. At all relevant times, the market for Venator's common stock was an efficient market for the following reasons, among others:

(a) Venator's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Venator filed periodic public reports with the SEC and NYSE;

(c) Venator regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Venator was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

111. As a result of the foregoing, the market for Venator's shares promptly digested current information regarding Venator from all publicly available sources and reflected such information in the price of Venator's shares. Under these circumstances, all purchasers of Venator shares during the Class Period suffered similar injury through their purchase of Venator shares at artificially inflated prices and the presumption of reliance applies.

112. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the severity of the damage caused by the Pori facility fire—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Pori facility to Venator's business

operations and the impact that could have on the Company's future revenue generation, that requirement is satisfied here.

**COUNT I**

**For Violations of Section 11 of the Securities Act**
**Against All Defendants**

113. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

114. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Venator ordinary shares sold pursuant or traceable to the Offerings, and who were damaged thereby.

115. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

116. Venator is the registrant for the IPO and the SPO. The defendants named herein were responsible for the contents and dissemination of the IPO Offering Materials and the SPO Offering Materials.

117. As the issuer of the shares, Venator is strictly liable to Plaintiff and the Class for the misstatements and omissions.

118. Liability under this Count is predicated on the Individual Defendants (only with respect to the SPO for Defendants Anderson, Ferrari, and Patrick) signing of the registration statements for the Offerings all Defendants' (only with respect to the SPO for Defendants Anderson, Ferrari, and Patrick) respective participation in the Offerings, which were conducted

pursuant to the Offering Materials. The IPO Offering Materials and the SPO Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

119. Plaintiff purchased shares in and/or traceable to the Offerings.

120. Plaintiff and the Class have suffered damages. The value of Venator ordinary shares has declined substantially after and as a result of Defendants' violations.

121. Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

122. By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

## COUNT II

### For Violations of Section 12(a)(2) of the Securities Act Against All Defendants

123. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

124. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Venator ordinary shares in and/or traceable to the Offerings, and who were damaged thereby.

125. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict

liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

126.    The Underwriter Defendants were statutory sellers of Venator shares that were registered in the IPO pursuant to the IPO Registration Statement and sold by means of the IPO Offering Materials.  The Underwriter Defendants were also statutory sellers of Venator shares that were registered in the SPO pursuant to the SPO Registration Statement and sold by means of the SPO Offering Materials.  By means of the Offering Materials, the Underwriter Defendants sold millions of Venator shares through the Offerings to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests.  In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the Offerings by means of the materially false and misleading Offering Materials.

127.    The IPO Offering Materials and the SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

128.    Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

129.    By reason of the foregoing, Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased Venator ordinary shares in and/or traceable to the Offerings, and who were damaged thereby.

**COUNT III**

**For Violations of Section 15 of the Securities Act Against the Selling Shareholders and the Individual Defendants**

130. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

131. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Venator ordinary shares in and/or traceable to the Offerings, and who were damaged thereby.

132. This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

133. As set forth in Count One above, Venator is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the IPO Offering Materials and the SPO Offering Materials.

134. The Individual Defendants, by virtue of their positions, voting power, ownership, rights as against Venator, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Venator within the meaning of Section 15 of the Securities Act. These defendants also had the power and influence, and exercised the same, to cause Venator to engage in the acts described herein, including by causing Venator to conduct the Offerings pursuant to the Offering Materials. The Company, meanwhile, controlled the Individual Defendants and all of its employees.

135. The Selling Shareholders were, at the time of the wrongs alleged herein and as set

forth herein, controlling persons of Venator within the meaning of Section 15 of the Securities Act. The Selling Shareholders were the majority owners and controlled the Company before, during and after the IPO and the SPO. In addition to controlling a majority of Venator's voting shares, the Selling Shareholders also appointed and had significant influence over Venator's management and members of its Board of Directors.

136. By reason of the foregoing, the defendants named herein each were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts One and Two above, based on their having signed or authorized the signing of the IPO Registration Statement and/or the SPO Registration Statement, selling Venator ordinary shares in the IPO and/or SPO, and/or having otherwise participated in the process that allowed the IPO and the SPO to be successfully completed. The defendants named herein are liable for the aforesaid wrongful conduct and are liable, to the same extent that Venator is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired Venator ordinary shares sold pursuant or traceable to the Offerings, and who were damaged thereby.

## COUNT IV

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Venator and the Officer Defendants

137. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

138. During the Class Period, Venator and the Officer Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Venator shares at artificially inflated prices.

139.    Venator and the Officer Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Venator's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

140.    Venator and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

141.    During the Class Period, Venator and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

142.    The Officer Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  The Officer Defendants engaged in this misconduct to conceal Venator's true condition from the investing public and to support the artificially inflated prices of the Company's shares.

143.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Venator's shares.  Plaintiff and the Class would not have purchased the Company's shares at the prices they paid, or at all, had they been aware

that the market prices for Venator shares had been artificially inflated by these defendants' fraudulent course of conduct.

144. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's shares during the Class Period.

145. By virtue of the foregoing, Venator and the Officer Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V

### For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants and the Selling Shareholders

146. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

147. The Officer Defendants and Selling Shareholders acted as controlling persons of Venator within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Venator, the Officer Defendants and Selling Shareholders had the power and ability to control the actions of Venator and its employees. By reason of such conduct, the Officer Defendants and Selling Shareholders are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

148. WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D. As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

E. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

149. Plaintiff demands a trial by jury.

DATED: July 31, 2019

*/s/ Avi Josefson*

Avi Josefson
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com
michaelb@blglaw.com

*Counsel for Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust*

Robert D. Klausner
**KLAUSNER KAUFMAN JENSEN & LEVINSON**

7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com

*Additional counsel for City of Miami General Employees' & Sanitation Employees' Retirement Trust*

**CERTIFICATION PURSUANT TO**
**THE FEDERAL SECURITIES LAWS**

I, Edgard Hernandez, on behalf of City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami Retirement Trust"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Pension Administrator of Miami Retirement Trust. I have reviewed the complaint with the System's legal counsel. Based on the legal counsel's knowledge and advice, Miami Retirement Trust has authorized the filing of the complaint.

2. Miami Retirement Trust did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Miami Retirement Trust is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Miami Retirement Trust's transactions in the Venator Materials PLC securities that are the subject of this action are set forth in the chart attached hereto.

5. Miami Retirement Trust has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Salkowitz v. Henry Schein, Inc.*, No. 18-cv-01428 (E.D.N.Y.)

6. Miami Retirement Trust has served as a representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

   *City of Miami General Employees' & Sanitation Employees' Retirement Trust v. RH, Inc.*, No. 17-cv-554 (N.D. Cal.)

7. Miami Retirement Trust will not accept any payment for serving as a representative party on behalf of the Class beyond Miami General's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 31 day of July, 2019.

Edgard Hernandez
Pension Administrator
*City of Miami General Employees' & Sanitation Employees' Retirement Trust*

**City of Miami General Employees' & Sanitation Employees' Retirement Trust**
**Transactions in Venator Materials PLC**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 8/3/2017 | 25,050 | 20.0000 |
| Purchase | 11/30/2017 | 15,115 | 22.5000 |
| Purchase | 12/13/2017 | 5,150 | 20.4331 |
| | | | |
| Sale | 8/14/2018 | (6,561) | 11.7958 |
| Sale | 8/14/2018 | (2,327) | 11.8144 |
| Sale | 8/15/2018 | (9,814) | 11.3033 |
| Sale | 8/15/2018 | (5,033) | 11.2463 |
| Sale | 9/21/2018 | (8,565) | 9.7920 |
| Sale | 9/24/2018 | (5,211) | 9.4977 |
| Sale | 9/25/2018 | (3,608) | 9.0583 |
| Sale | 9/26/2018 | (1,867) | 9.0155 |
| Sale | 9/27/2018 | (2,329) | 8.8560 |